UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| CONSTANCE O. NEAVES, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 23-007-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| TONY HAMPTON, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Constance Neaves called 911 on November 13, 2021, after her mother, Opal Webb, collapsed and was unresponsive. EMS workers found the 92-year-old Webb in "very poor condition," with overgrown nails and large decubitus ulcers on her lower extremities. Following Webb's arrival at the local emergency department, hospital staff proclaimed it "100 percent neglect" and "the worst case [they'd] ever seen." Webb died two days later as a result of septic shock secondary to translocation of bacteria from skin breakdown.

The Scott County Sheriff's Office commenced an investigation and Neaves ultimately was charged with manslaughter in the second degree based on these events, although the charge was later dismissed without prejudice. Neaves now brings a host of claims against the officers involved, including malicious prosecution, false arrest, and defamation. The defendants have filed a motion for summary judgment which will be granted. While the precise reasons for granting the defendants' motion vary depending upon the particular claim, there is a common thread underpinning the Court's analysis: there was probable cause to believe that Neaves had committed the crime charged.

## I.      Background

Opal Webb ("Webb") and her daughter Constance Neaves ("Neaves") lived next door to each other in Sadieville, Kentucky.  Webb was physically active and drove a car well into her eighties.  [Record No. 84-3, pp. 4-5]  Her primary care physician, Benjamin Lyon, M.D., reported that Webb was not one to "run to the doctor with every little ache or pain," but would come if he instructed her to do so.  Webb was diagnosed with cirrhosis of the liver as of September 2020, which she and Neaves attributed to Webb's long-term use of a medication intended to prevent a recurrence of breast cancer.  [*See* Record No. 74-1, p. 375.]  Following an August 2019 wellness visit, Dr. Lyon noted that Webb had no edema in her extremities and was "doing very well for her age."  [Record No. 74-1, p. 118]

Around that same time, when Webb was 90 years old, her balance declined, and she began falling at home.  Following a couple of incidents which necessitated stays at a local rehabilitation center, Webb moved in with Neaves in October 2020.  Neaves was 70 years old at the time and was living alone after a recent divorce.  [Record Nos. 70-6; 81-4, p. 5; 84-31]  By that time, Webb had stopped driving and Neaves took her to her medical appointments.

Webb saw physician's assistant Mandy Mynhier in October 2020 for "fluid in legs," which she complained was leaking occasionally.  [Record No. 74-1, p. 130]  Medical records indicate that there were no pressure ulcers or lesions on Webb's lower extremities at that time.  *Id.* at pp. 249, 260.  Mynhier increased Webb's dosage of Lasix which, by December 2020, seemed to have improved the condition.  *Id.* at p. 124.  Webb also received home health services for seven weeks beginning on October 5, 2020, which included the application of compression dressings to her legs.  *Id.* at 151, 274.  Webb was discharged from home health on November 23, 2020, having met her treatment goals.  *Id.* at 151.

Adrian Chaffin, D.O. saw Webb at Georgetown Community Hospital's ("GCH") emergency department ("ED") on February 27, 2021, when she presented with an arm injury after a fall.  *Id.* at p. 178.  Webb was diagnosed with a left proximal humerus fracture and was instructed to follow up with an orthopedist.  Several days later, she saw Matthew Birdwhistell, D.O. at Georgetown Internal Medicine complaining of pain due to her broken arm.  *Id.* at p. 122.  Birdwhistell refilled her prescription for pain medication and noted that her lower extremities were "grossly edematous."  *Id.* at p. 122.  Birdwhistell further noted that "she may need reevaluated for her fluid in the near future."  *Id.* at p. 123.  Webb followed up with David Waespe, M.D. for her arm fracture on April 27, 2021.  He recommended that she begin physical therapy with home health.  *Id.* at 170.

In July 2021, Neaves retained Home Instead, an agency that provides in-home care services for seniors, in hopes that they could stay with Webb when Neaves needed to be away for brief periods of time.  [Record Nos. 84-11; 70-17]  Webb's plan of care indicated that she would receive help with ambulation, bathing, continence needs, dressing, eating, and toileting. Neaves explained, however, that Webb was a private person and really did not want anyone other than Neaves to help her with personal care.  [Record No. 70-17]  One exception was Home Instead employee June Willoughby, whom Webb liked particularly well, and was allowed to take a more direct role in her care.  Other than Willoughby, Home Instead staff usually performed cleaning chores when they came to the home.  *Id.*  A Home Instead staff member typically visited three times per week beginning August 9, 2021, and ending November 9, 2021.  [Record No. 84-12]

Neaves and Webb stayed up late on the night of November 12, 2021, because Webb was "very restless" and Neaves could hear her talking to someone even though no one else

was there.  [Record No. 84-2, p. 7]  The following morning, Neaves was preparing breakfast when she heard a loud noise in the living room where Webb normally slept on a couch.  Neaves immediately saw that Webb had fallen over and collapsed on the right side of the couch. According to Neaves, Webb was unconscious and had lost control of her bowels when she collapsed.  Neaves called 911, reporting to dispatch that Webb had deteriorated in the last few days, had not been eating or drinking, and was "incoherent."  [Record Nos. 70-2; 84-2, pp. 7-8]

Neaves began cleaning her mother while waiting for Georgetown-Scott County EMS to arrive.  According to Neaves, a paramedic told her that emergency staff would finish cleaning up Webb on the way to the hospital.  EMS found that Webb was in "very poor condition," "extremely frail," and was "responsive to painful stimuli only."  [Record No. 84-16]  She was lying on her back, inclined toward the left side and contracted with her legs drawn upward.  EMS further remarked that her eyes had pus "oozing from the medial corners" and her mouth "appeared dirty with unidentified material on her teeth and around her mouth."  *Id.* EMS also noted various decubitus ulcers on Webb's lower extremities and severely overgrown nails.  Additionally, it was observed that she had a "large quantity of feces in her [D]epends," which "appeared to not be recent."  *Id.*

Webb was transported to GCH where ED staff documented that she appeared emaciated, malnourished, and lethargic.  She was observed to have various areas of tissue breakdown, including "many deep tissue injuries," as follows:

> Right leg inner shin 4cmx3cm Right inner ankle deep tissue injury 2cmx2cm, right heel deep tissue injury, small skin tear on right knee, Right inner deep tissue injury 3cmx2cm, Right medial foot tissue injury 1cmx0.5cm, Left toe necrotic, fourth and fifth digit deep tissue injury, left inner foot deep tissue injury 6cmx2cm. left inner ankle stage 1 1cmx1cm, left inner leg shin area stage

> 3 ulcer 6cmx2cm, necrotic left back of calf, left knee stage 1 4cmx2cm, Left inner thigh stage 2cmx1cm, left heel deep tissue injury, left outer knee deep tissue injury 2cmx1cm stage 1, back 3cmx0.5 stage 1 on back, left flank 4 cmx2cm stage 1, lumbar ulcer 1cmx1cm, sacrum 13cmx3cm deep tissue, left buttocks and hip 18cmx11cm full open wounds and three open areas inside unstageable, left elbow deep tissue, left ear stage 1, left ear lobe stage 1, left shoulder front 2cmx2.5cm stage 2, right forearm bruising, bilateral lower leg.

[Record No. 70-4, pp. 2-3]  Further, staff observed that Webb's brief was full of feces and stuffed with feminine pads and paper towels.  *Id.* at pp. 5-6.  Although one portion of the ED record states that Webb was "nonverbal," another reads: "Patient states he/she is victim of abuse, neglect, and/or violence."  *Id.* at pp. 1-2.  An unidentified GCH staff member called 911, stating: "We need to file for neglect.  It's really bad."  [Record No. 70-2]

Scott County Sheriff's Deputy Everett Humphries arrived at the ED a short time later, where hospital staff reiterated, "it's really bad."  [Record No. 70-6]  Staff brought Humphries into Webb's room and showed him the wounds on her feet, legs, hips, buttocks, back, and sacrum and told him about the paper towels that were stuffed in her diaper.  Staff advised Humphries that Webb's toes and the backs of her legs were necrotic and that "this didn't happen in just two days."  *Id.*

Humphries interviewed Neaves in a private consultation room outside the ED.  When asked what had happened that day, Neaves explained that Webb had liver cirrhosis and had quit eating and drinking, leading Neaves to think she had "better get her to the hospital." [Record No. 70-6]  Neaves stated that the "places on [Webb's] legs just started like the last day."  She further explained that she had placed an extra pad in Webb's briefs when she changed them the previous evening to provide extra protection against incontinence.  When asked about Webb's medical care, Neaves reported that she had been taking Webb to a doctor

"pretty regular[ly]" until she stopped walking.  Neaves stated that she had been telling Webb that she was going to have to go to the hospital but Webb did not want to go.

Humphries returned to Webb's room where he advised staff of Neaves' statements. One nurse immediately retorted: "This is 100 percent neglect."  Adrian Chaffin, D.O., who happened to be the attending physician that day, stated that cirrhosis was the "least of [Webb's] concerns."  Another provider questioned the reason for the "seventeen paper towels that were literally embedded in her skin."  Chaffin explained to Humphries that lying in the same position for prolonged periods of time leads to pressure ulcers.  It appeared to Chaffin that Webb had been lying on her left side predominantly and that many areas on that side had sustained a lack of blood flow, some to the point of nonviability.

Humphries then interviewed Chaffin privately outside the ED.  Chaffin stated that it looked like Webb's diaper had not been changed in days and that she had dried fecal matter on her skin.  While Chaffin admittedly was not "an expert in adult neglect," it appeared to him that the situation had "definitely been going on for more than a day or two."  Chaffin noted that severe decubitus ulcers like those on Webb's hip and buttocks take more than two days to develop.  Further, there was pus between her toes and the little toe was so necrotic that "you could probably grab [it] and twist it and pop it off."  According to Chaffin, such tissue breakdown would likely take weeks to develop.  Ultimately, it appeared to Chaffin that Webb, who was profoundly dehydrated, had "just laid there and been left to rot."  Humphries filed a report of adult neglect with the Kentucky Cabinet for Health and Family Services the same day.  [Record No. 70-8]

Later that day, Gopi Gundumalla, M.D., admitted Webb to GCH to receive palliative care.  [Record No. 81-23]  Webb passed away on November 15, 2021.  [Record No. 70-14]

Dr. Gundumalla listed her immediate cause of death as septic shock secondary to translocation of bacteria from skin breakdown.  [Record No. 7-10]

The Scott County Sheriff's Office investigation into Webb's death was assigned to Detective Steve Quire on December 26, 2021.  [Record No. 70-12]  Quire began by reviewing Humphries' body camera footage and case documentation.  Thereafter, he interviewed multiple individuals including Neaves.  Quire and another officer spoke with Neaves at her residence on January 12, 2022.  [Record No. 70-17]  Neaves told the officers that Webb had started using a wheelchair about six months earlier.  She explained that after home health services were discontinued in November 2020, Webb began to decline quickly.  Neaves advised officers that she told her mother, "We need to get them back," but Webb refused, stating that she did not want to be bothered with more people.  Neaves also told the officers that Webb "got tired of taking medicine and . . . going to the doctor" around that time.  Neaves tearfully stated, "She would get upset with me because I would want to take her and she didn't want to go."  *Id.*

Neaves decided to stop the interview after Quire read her *Miranda* rights, but she called him to continue the conversation two days later.  He recorded the telephone call on his body camera.  [Record No. 70-20]  Neaves reported that Webb's health began to decline significantly five or six weeks prior to her death.  Neaves wanted to call hospice to see if they could check on Webb, but Webb was adamant that she did not want anyone coming into the house.  And Neaves did not want to argue with her and make the 92-year-old Webb feel worse.  According to Neaves, Webb had "a little bit of dementia," but Dr. Lyon had said it was "very, very early."

- 7 -

When Quire inquired about any recent medical care that Webb might have had, Neaves mentioned the treatment she had received for her broken humerus in February and March 2021. She then reiterated that Webb was stubborn and would not allow Neaves to take her to a doctor when she needed to go.  Neaves said, "I know that I should've had her a nurse here . .  but she was so tired of people coming and going and it just made it hard on me to get her fussing and get her upset and everything."  Further, Neaves did not realize that Webb "was as bad as she was," despite the two spending so much time together.

Quire conducted a telephone interview with Dr. Chaffin on January 13, 2022, which he also recorded on his body camera.  [Record No. 70-18]  Chaffin could not say "how long [Webb] was in the condition she was in," or "over what time period" the pressure ulcers developed.  Following Webb's presentation to the ED, Chaffin had done some research regarding decubitus ulcers and learned that they can begin forming within hours.  However, Chaffin was nearly certain that the severe wounds Webb had could not develop within even one or two days.

Chaffin added that Webb was severely dehydrated and had not drunk "in a considerable amount of time."  He believed that if she had been brought in earlier for medical treatment, "she would not have ended up in the shape she was in."  Chaffin stated that Webb's condition "definitely required medical condition," and he agreed with the officer's suggestion that a "normal person" having seen someone in that condition would have realized that she needed to get to a hospital.  Chaffin ultimately concluded that the dehydration and pressure ulcers contributed to Webb's overall condition, including septic shock.

Quire conducted a recorded telephone interview of Home Instead employee June Willoughby on January 19, 2022.  [Record No. 70-23]  Willoughby saw Webb about three

times per week from October 5, 2021, through November 5, 2021.  She took notes regarding each visit, something Willoughby did for each patient she felt was "transitioning" or who was not "going to be here long."  She reported that Webb "never had any red marks on her," that "she was always kept clean," and that she ate well every day.

Willoughby knew that Webb was bathed every day mainly because Webb and/or Neaves told her so.  However, Willoughby did give Webb a sponge bath at times.  She reported that on October 26, 2021, Webb undressed completely for a bath and Willoughby did not observe any skin breakdown.  And on November 5, "she had zip, . . . nothing, on her." Willoughby did not know how or why the ulcers appeared but was adamant that Webb was not neglected.

Detective Quire filed a criminal complaint the following day with the Scott County District Court charging Neaves with manslaughter in the second degree for wantonly causing Webb's death.  [Record Nos. 70-24; 70-26]  District Judge Mary Jane Phelps issued a warrant for Neaves' arrest and set cash bail in the amount of $50,000.[1]  [Record No. 70-27]  Two deputies went to Neaves' home and arrested her the following day.  The Scott County Sheriff's Office issued a press release on January 21, 2022, which detailed some of the information included in the criminal complaint and stated that Neaves had been arrested and charged with manslaughter in connection with the death of her mother.  The Sheriff's Office subsequently published on its Facebook page the press release, along with Neaves' mugshot.  [Record No. 1-7]

---

[1]      Judge Phelps responded to Quire's initial complaint by asking a few clarifying questions.  [See Record No. 70-25.]  Phelps issued the warrant after Quire submitted a supplemented complaint.  [See Record No. 70-26.]

Neaves was arraigned on January 27, 2022, and was released on a $5,000 bond.  Her preliminary hearing was set for February 17, 2022.  However, before that date arrived, Neaves' attorney filed a notice of intent to subpoena Webb's medical records as he believed they would show that Webb was simply nearing the natural end of her life, thus exonerating Neaves. [Record No. 73-2, p. 55]  The preliminary hearing was eventually scheduled for June 30, 2022. But after reviewing the medical records obtained by Neaves' attorney, the Scott County Attorney determined that moving forward with the charge would require expert testimony of the treating physician.  [Record No. 70-38]  Also having been advised that Neaves intended to call numerous witnesses at the preliminary hearing, and wishing to avoid a "mini trial," the prosecutor decided the appropriate action was to dismiss the case without prejudice.  *Id.*  He noted that the Commonwealth Attorney's office could review the case and present it to the grand jury if he believed it was appropriate and supported by the evidence.  *Id.*  On Jun e30, 2022, Judge Phelps dismissed the case without prejudice.[2]

Neaves filed a Complaint with this Court on January 16, 2023, alleging claims under 42 U.S.C. § 1983 and the Fourth Amendment of the United States Constitution.  Namely, she asserted claims of malicious prosecution against Humphries and Quire and false arrest against Quire.  Her Complaint also included analogous claims under Kentucky law against these defendants, as well as claims of defamation against Quire, negligent investigation against Humphries and Quire, and negligent training and supervision against Scott County Sheriff

---

[2]     The courtroom minutes included in the Dismissal Order state, in part: "The Court further noted that the medical records completely exonerated the defendant and questioned how the charge could have ever been brought."  [Record No. 70-39]  The plaintiff cites this comment in support of her position but, unsurprisingly, provides no authority to show that this Court should give any weight to Judge Phelps' comments.  The Court also notes that the minutes incorrectly state that Dr. Chaffin was not listed in the GCH ED documentation from November 13, 2021.

Tony Hampton.  The matter is now pending for consideration of the defendants' motion for summary judgment with respect to all of Neaves' claims.

## II.      Motion in Limine

The Court considers an evidentiary issue before turning to the plaintiff's substantive claims.  Neaves' attorney deposed Judge Mary Jane Phelps on February 28, 2024.[3]  Judge Phelps testified regarding her thought processes leading up to Neaves' prosecution and the dismissal of her charge, among other matters.  The defendants have filed a motion in limine seeking to exclude or limit Phelps' testimony, mainly because "the testimony of the mental processes of a judge [is] not to be considered."  *Perkins v. LeCureux*, 58 F.3d 214, 220 (6th Cir. 1995).

Neaves contends, however, that the defendants make an overly broad statement concerning a judge's ability to testify and that, instead, a judge may not testify about her mental process in a later proceeding that challenges that judge's earlier determination in the same proceeding.  *See Perkins*, 58 F.3d at 220 (concluding that a judge could not testify in a habeas proceeding with respect to his thought process regarding the sentence being challenged).  Neaves asserts that, since she is challenging law enforcement's actions through an unrelated proceeding, Phelps may testify concerning her thoughts during Neaves' prosecution.

Neaves has not identified any authority indicating that the rule against judicial testimony should be construed so narrowly and applicable case law says otherwise.  For example, in *Afanasiev v. Alvarez*, 319 So.3d 697 (Fla. 3d Dist. Ct. App. Mar. 31, 2021), Alvarez filed for divorce and a permanent domestic violence injunction against Afanasiev.

---

[3]      Judge Phelps retired from the bench in January 2023.  [Record No. 73-2, p. 17]

Afanasiev later sued Alvarez and her attorney for malicious prosecution based on their institution of the domestic violence action.  He then asked the trial court judge to recuse from the divorce action and domestic violence case, arguing that he would be calling the judge as a material witness in his malicious prosecution action.  *Id.* at *702.  The court denied Afanasiev's request, stating "it is highly unlikely that the trial court could be compelled to testify in Afanasiev's malicious prosecution case."  *Id.*

In *Mitchell, Maxwell & Jackson, Inc. v. State*, 117 N.Y.S.3d 442 (Ct. Claims N.Y. Apr. 2, 2019), the plaintiffs alleged malicious prosecution arising from administrative proceedings brought by the New York Department of State.  The plaintiffs sought to depose the administrative law judge who presided over the administrative hearing at which charges against the plaintiff were upheld.  *Id.* at 445.  The court rejected the plaintiff's request, citing the "cardinal principle of Anglo-American jurisprudence[:] a court speaks only through its minutes."  *Id.* at 446 (quoting *Perkins*, 58 F.3d at 214).  Notably, the court observed that, while the language in *Perkins* specifically addresses subsequent attacks on the decision as to which the testimony is sought, "the same principle applies to *any testimony by a judge about his thoughts behind a judicial ruling*."  *Id.* (emphasis added).  *See also Drake v. Village of Johnstown*, 2011 WL 4091846, at *3 (S.D. Ohio Sept 14, 2011) (citing *Washington v. Strickland*, 693 F.2d 1243, 1263 (5th Cir. 1982) ("It is a firmly established rule in our jurisprudence that a judge may not be asked to testify about his mental processes in reaching a judicial decision.").

The United States District Court for the Eastern District of Arkansas confronted this issue more recently in *Banks v. Moore*, 2020 WL 7702171 (E.D. Ark. Dec. 28, 2020).  Banks sued a city police officer for malicious prosecution and other claims after the officer arrested

him and took a blood sample after obtaining a warrant from a judge.  Banks subpoenaed the judge for a deposition, which the judge sought to quash.  The court granted the motion to quash, noting that "a judge cannot be required to testify regarding his mental processes in formulating an official judgment."  *Id.* at \*2 (citing *United States v. Morgan*, 313 U.S. 409, 422 (1941)); *Cavitt v. Wills*, 2006 WL 3792046, at \*1 (W.D. Ark. 2006) ("The overwhelming authority concludes that a judge may not be compelled to testify concerning the mental processes used in formulating official judgments or the reasons that motivated him in the performance of his official duties.").

Phelps' testimony is admissible to the extent it concerns her personal knowledge of the facts surrounding Neaves' prosecution.  However, the defendants argue that such testimony should be excluded because it is cumulative and "tainted" since Phelps reviewed background documents prior to her deposition.  But the general rule is that relevant evidence is admissible.  *See* Fed. R. Evid. 402.  And while the Court has an interest in avoiding the needless presentation of cumulative evidence at trial, this is less of a concern at the summary judgment stage.  *See* Fed. R. Evid. 403.  Finally, the Court is not persuaded by the defendants' conclusory assertion that Phelps' testimony is tainted simply because she reviewed documents in preparation for the deposition.  There is nothing to suggest that she did not independently recall the facts regarding Neaves' prosecution, so there is no basis to exclude that portion of her testimony.

## III.    Standard of Review

Summary judgment is appropriate if there is no genuine dispute with respect to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In other words, the Court must determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Int'l Outdoor, Inc. v. City of Troy, Michigan*, 974 F.3d 690, 697 (6th Cir. 2020). The moving party has the initial burden to show that there is no genuine issue of material fact, but once the moving party has met its burden, the nonmoving party must demonstrate that there is sufficient evidence from which the jury could render a verdict in its favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Electro-Mechanical Corp. v. Ogan*, 9 F.3d 445, 448 (6th Cir. 1993).

In reviewing a motion for summary judgment, the Court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Max Arnold & Sons, LLC v. W.L. Hailey & Co., Inc.*, 452 F.3d 494, 499 (6th Cir. 2006). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *Donald v. Sybra, Inc*., 667 F.3d 757, 760-61 (6th Cir. 2012).

When a defense of qualified immunity is asserted, the analysis is altered somewhat. Specifically, the existence of a disputed, material fact does not preclude summary judgment if the defendants cannot be shown to have violated clearly established law. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996).

### IV.    Discussion

### A.    Qualified Immunity

The defendants assert that they are entitled to the protections of qualified immunity with respect to Neaves' constitutional claims. This doctrine shields government officials

- 14 -

performing discretionary functions from liability for civil damages unless the contours of the asserted right were sufficiently clear such that any reasonable officer would have understood that what he was doing violated that right. *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Murray v. Dep't of Corrs.*, 29 F. 4th 779, 786 (6th Cir. 2022). Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotation marks omitted)). Accordingly, a defendant is entitled to summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that a defendant violated a constitutional right and the right was clearly established. *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

The Court may consider the two factors in any order, but "both must be answered in the affirmative for the plaintiff's claim to proceed." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (citing *Pearson*, 555 U.S. at 236). Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). Although on summary judgment the Court construes the facts in favor of the plaintiff, when a defendant raises the defense of qualified immunity, the plaintiff must show that the facts and inferences would allow a reasonable to juror to conclude that the defendant violated a clearly established constitutional right. *See Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020).

- 15 -

## B. Malicious Prosecution under the Fourth Amendment

The Sixth Circuit recognizes a "constitutionally cognizable claim of malicious prosecution under the Fourth Amendment, which encompasses wrongful investigation, prosecution, conviction, and incarceration." *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010).  To prove a § 1983 claim for malicious prosecution, the plaintiff must show:

> (1) a criminal prosecution was initiated against the plaintiff, and the defendant made, influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) the plaintiff suffered a deprivation or liberty, as understood under Fourth Amendment jurisprudence, apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor.

*Id.* (quoting *Sanders v. Jones*, 845 F.3d 721, 728 (6th Cir. 2017)).

### 1. Defendant Humphries

Neaves asserts that her only "concerns" with Humphries are: "(1) his failure to take steps to preserve evidence for further investigation; (2) his failure to ensure that [Webb's] body be preserved for autopsy purposes in the event she should die in short order; and (3) his failure to do anything to take steps to investigate this matter further following his November 13, 2021 witness interviews at GCH."  [Record No. 84]  Neaves has not identified any authority in which an officer's failure to perform additional investigation has been construed as malicious prosecution, particularly where that officer was not involved in charging the defendant.  And there is no suggestion that Humphries made any misrepresentations or omissions in his investigatory materials or that he made, influenced, or participated in the decision to prosecute her.  *See Sykes*, 625 F.3d at 314-16 (officer who made "affirmative misrepresentations and omissions in his arrest-warrant application and investigative report" which "clearly led to the

- 16 -

plaintiffs' arrests" had participated or influenced the decision to prosecute).  Accordingly, Defendant Humphries is entitled to qualified immunity with respect to this claim.

## 2.    Defendant Quire

The Court focuses on the probable cause inquiry in turning to Neaves' claim against Defendant Quire.  Kentucky law provides that "[a] person is guilty of manslaughter in the second degree when he wantonly causes the death of another person."  Ky. Rev. Stat. 507.040(1).  Further, [a] person acts wantonly . . . when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists" and the risk is "of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." Ky. Rev. Stat.  501.020(3).

"Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion."  *Sykes*, 625 F.3d at 306 (quoting *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005)).  Probable cause exists if there is an objectively reasonable basis to conclude that a crime has been committed.  *McClain*, 444 F.3d at 562.  Accordingly, the Court considers the totality of the circumstances and whether the facts and circumstances known to Quire could lead a reasonable person to believe that Neaves had committed the offense of second-degree manslaughter.  *See id*. (citing *Hinchman v. Moore*, 312 F.3d 198, 204 (6th Cir. 2002)).  "Probable cause is not a high bar."  *United States v. Christian*, 925 F.3d 305 (6th Cir. 2019) (quoting *United States v. Wesby*, 583 U.S. 48, 57 (2018)).  However, "[t]he existence of probable cause is a jury question, unless there is only one reasonable determination possible."  *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003).

- 17 -

Construing the facts in the light most favorable to the plaintiff, Quire reasonably determined there was probable cause to charge Neaves with second-degree manslaughter.  On November 13, 2021, Webb had numerous decubitus ulcers, mainly on her left side, which Dr. Chaffin said would have resulted from remaining in the same position for extended periods of time.  Some of the ulcers were stage IV or unstageable.  Dr. Chaffin indicated that such severe necrosis would have taken a significant length of time to develop.  Dr. Lyon also opined that the bed sores would not "just suddenly appear."  [Record No. 84-3, p. 12]   Neaves acknowledged that Webb could not walk and was dependent upon Neaves completely.  Neaves told Quire repeatedly that she knew she should have gotten medical attention for her mother and conceded that she had not taken Webb for regular doctor visits since she stopped walking about six months before her death.  Chaffin agreed that a "normal person" seeing someone in Webb's condition would have recognized that she needed medical intervention.  Further, he stated that had she received medical help earlier, she likely would not have been in the same condition.

Neaves asserts in her response to the defendants' motion for summary judgment that Quire's sworn complaint was "premised on unfounded assumptions, contained false and misleading factual averments, and intentionally omitted significant and highly material exculpatory evidence."  [Record No. 84, p. 2]  She focuses largely on Quire's reference to the "abuse screen" entries in the ED records from November 13.  GCH nurse Anna Simmons was deposed in this matter and explained that Webb was not sufficiently responsive at the time to make such a statement.  Simmons further explained that there is a computer glitch in GCH's system such that "Pt complained of abuse/neglect" automatically populates that when medical staff make the selection for suspected abuse or neglect.

- 18 -

While this "glitch" in GCH's system may have resulted in an inaccuracy in the ED notes, it remains that notes *did* indicate that Webb complained of abuse or neglect.  Quire was not present at the hospital on November 13, 2021, and there is nothing to suggest that he deliberately included inaccurate information in the complaint.  Regardless, even if that fact is excised from the complaint, there is ample evidence to establish probable cause.  *See Butler v. City of Detroit, Michigan*, 936 F.3d 410, 417-18 (6th Cir. 2019) (to overcome qualified immunity, plaintiff must show that the defendant stated a deliberate falsehood or reckless disregard for the truth *and* that the false or omitted information was material to the finding of probable cause).

To the extent Neaves suggests that Quire failed to consider or omitted other exculpatory information from the complaint, she does not explain what was omitted or not considered.  For instance, she suggests that he should have obtained records from Dr. Lyon's office, but Webb had not seen Dr. Lyon since October 28, 2020.  Although she saw his assistant Mandy Mynhier in March 2021, it is unclear how this record would have impacted Quire's decision.  Neaves also suggests that Quire should have included additional information from his January 14 interview of her but does not state what portions of the interview she believes are exculpatory.  [Record No. 84, p. 9]

Neaves also contends that Quire should have interviewed EMS personnel, performed follow-up interviews with ED staff, and consulted with a wound care specialist.  But Neaves does not indicate what additional information she believes could have been gleaned from further discussions with EMS and ED personnel.  And Neaves has not established that consultation with a wound expert was necessary, as "[t]he probable cause requirement was not intended to be a tool to divine what actually happened.  That role is fulfilled by the high burden

- 19 -

of proof required at criminal trials." *Cheolas v. City of Harper Woods*, 467 F. App'x 374, 380 (6th Cir. 2023).

Finally, Neaves focuses heavily on Webb's purported refusal to go to a nursing home and desire to pass away at home. While Neaves might have wanted to "honor [her mother's] wishes," the caretaker of a vulnerable adult has an obligation to avoid neglecting that individual. *West v. Commonwealth*, 935 S.W.2d 315, 318 (Ky. Ct. App. 1996); Ky. Rev. Stat. § 209.020(4). Webb had numerous severe pressure ulcers, including skin breakdown to the point of necrosis, and died as a result of septic shock secondary to translocation of bacteria from these skin disruptions. And even though Neaves knew that her mother needed medical attention, she concedes that Webb did not receive any medical care for the last six months of her life.[4]

Based on the foregoing, Quire reasonably believed he possessed probable cause to charge Neaves with manslaughter in the second degree. Therefore, he is entitled to the protections of qualified immunity with respect to Neaves' claim of malicious prosecution.

### C.    False Arrest Under the Fourth Amendment

Neaves contends that Quire violated her Fourth Amendment right to be free from "false arrest," but Quire was not one of the officers who actually effected Neaves' arrest. While a plaintiff *may* assert a false arrest claim against a non-arresting officer, "no *clearly established* law compels the conclusion that officers who neither arrested the plaintiff nor swore false statements in a warrant affidavit can be liable for false arrest." *Schulz v. Gendregske*, 544 F.

---

[4]    The record indicates that Webb had not been to a doctor since she saw Dr. Waespe, concerning her arm fracture on April 27, 2021. However, during the January 14, 2022 telephone interview, Neaves told Quire that Dr. Lyon had prescribed a sedative for Webb over the phone the previous week.

App'x 620, 625 (6th Cir. 2013) (emphasis added).  Further, a claim of false arrest requires the absence of probable cause for arrest.  *Buttino v. City of Hamtramck*, 87 F. App'x 499, 502 (6th Cir. 2004).  As previously explained, probable cause for Neaves' arrest existed in this case. Accordingly, Defendant Quire is entitled to qualified immunity with respect to this claim.

### D.     State Law Claims

### 1.     Malicious Prosecution

Kentucky's malicious prosecution standard is similar to that applied under federal law. However, Kentucky's standard is more stringent in that a showing is required that the defendant acted with malice.  *Compare Martin v. O'Daniel*, 507 S.W.3d 1, 11-12 (Ky. 2016) (requiring the plaintiff to show that the defendant acted with malice) *with King v. Harwood*, 852 F.3d 568, 580 (6th Cir. 2017) (recognizing that malice is not an element under Sixth Circuit jurisprudence).  But under both standards, the plaintiff is required to show that the defendant "initiated, continued, or procured . . . a proceeding" against her and acted without probable cause.  *See Martin*, 507 S.W.3d at 11-12.  For the reasons already explained, Neaves cannot make this showing with respect to Defendants Humphries or Neaves.  Accordingly, they are entitled to summary judgment with respect to her claim of malicious prosecution under Kentucky law.

### 2.     False Arrest and Wrongful Detention

Claims of false arrest and false imprisonment are consolidated when the alleged torfeasor is a law enforcement officer.  *Estep v. Combs*, 366 F. Supp. 3d 863, 883 (E.D. Ky. 2018); *Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007) (declaring that, "[f]rom this point forward, . . . we shall refer to the torts of false imprisonment and false arrest together as false imprisonment").  To be liable for false imprisonment, the defendant must have intentionally

- 21 -

confined the victim of the alleged tort and the confinement must have been unlawful.  *Dunn*, 226 S.W.3d at 71.

Quire argues that he is entitled to qualified official immunity under *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001), which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment.  Qualified official immunity applies to the negligent performance by public officers of discretionary acts done in good faith that are within the scope of the employee's authority.  *Id.*  The Court notes that an officer's decision to seek an arrest warrant is a discretionary function.  *See, e.g., Baughman v. Brooks*, 2016 WL 8731438, at *3 (E.D. Ky. Apr. 29, 2016) (plaintiff asserting a false imprisonment claim did not dispute that the arresting officer was performing a discretionary function).  There also is no dispute that Quire acted within his authority in filing a criminal complaint.

The good faith component asks whether the official's conduct was objectively unreasonable or if the official willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive.  *Yanero*, 65 S.W.3d at 523.  "Once the officer or employee has shown *prima-facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith."  *Cole v. Shadoan*, 782 F. Supp. 2d 428, 433 (E.D. Ky. 20110 (quoting *Yanero*, 65 S.W.3d at 522).  Neaves did not respond to the defendants' motion seeking summary judgment with respect to this claim, so she necessarily has failed to meet her burden regarding Quire's entitlement to qualified official immunity.  The Court additionally notes that the record is devoid of evidence indicating that Quire's conduct was objectively unreasonable or that he acted with a corrupt motive.

### 3.    Defamation

Neaves asserts a claim of defamation against Quire based on the criminal complaints, the press release, and the Facebook post.  But as Quire argues in his motion for summary judgment, Kentucky law provides that "statements in pleadings filed in judicial proceedings are absolutely privileged when material, pertinent, and relevant to the subject under inquiry." *Adams v. Lexington-Fayette Cnty. Urban Gov't*, 2023 WL 6205415, at \*8 (E.D. Ky. Sept. 22, 2023) (concluding that allegations made in a detective's criminal complaint could not form the basis of a defamation claim) (citing *Heavrin v. Nelson*, 384 F.3d 199, 202 (6th Cir. 2004)). "Further, statements protected by absolute privilege keep their privilege even when republished." *Id.* (citing *Ohnemus v. Thompson*, 594 F. App'x 864, 869 (6th Cir. 2014)).

Neaves has failed to respond to Quire's motion for summary judgment with respect to this claim, which the Court interprets as her acknowledgment that the statements are, in fact, privileged.  Accordingly, Quire is entitled to summary judgment.

### 4.    Negligent Investigation

The basis for Neaves' "negligent investigation" claim is not entirely clear.  Her Complaint is vague with respect to this claim and alludes to the "deficient criminal investigation" and the defendants' "acts and omissions."  [Record No. 1, ¶¶ 117-18]  The Court can only assume that Neaves is referring to Humphries' alleged failure to preserve evidence and/or require an autopsy and Quire's failure to interview additional witnesses including a wound care expert.  But any negligence claim requires proof of a duty owed to the plaintiff, a breach by the defendant, and a consequent injury.  *McNally v. Tabor*, 2019 WL 6044882, at \*5 (E.D. Ky. Nov. 15, 2019) (citing *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003)).

- 23 -

Although police officers owe a general duty to the public to investigate crimes, this does not create the type of duty sufficient to sustain a negligence action. *See Grant v. City of Raceland*, 2014 WL 3020383, at *1-2 (Ky. Ct. App. July 3, 2014). Such a duty only arises when a "victim is in state custody or was otherwise restrained by the state actor at the time in question, and that the violence or other offensive conduct was perpetrated by a state actor." *Id.* (citing *Fryman v. Harrison*, 896 S.W.2d 908, 910 (Ky. 1995)).

Like several of her other claims under Kentucky law, Neaves did not respond to the defendants' motion for summary judgment. Accordingly, the motion will be granted with respect to this claim.

### 5.        Negligent Training and Supervision

Neaves' Complaint alleges merely that Scott County Sheriff Tony Hampton "was grossly negligent and/or negligent in the training, supervision, and discipline of Defendants Quire and Humphries, resulting in [Neaves] being deprived of her right to be free from false arrest, false imprisonment, malicious prosecution, and defamation." [Record No. 1, ¶ 122] To prove a claim for negligent training or supervision, a plaintiff must prove that the defendant knew or had reason to know of the employee's harmful propensities; that the employee injured the plaintiff; and that the defendant's training or supervision of the employee proximately caused the plaintiff's harm. *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 849 (Ky. 2005).

As the defendants note, decisions regarding officer training and supervision are often discretionary functions. *See Upper Pond Creek Vol. Fire Dep't, Inc. v. Kinser*, 617 S.W.3d 328, 338 (Ky. 2020) (J. Wright, dissenting). And there is no suggestion that Defendant Hampton acted outside the scope of his authority or in bad faith with respect to these issues,

- 24 -

so he is likely protected by qualified immunity under *Yanero*.  Regardless, Neaves has not identified evidence indicating that Humphries or Quire acted wrongfully or had "harmful propensities," so her claim of negligent training or supervision necessarily fails.  And again, she has failed to respond to this portion of the defendants' motion for summary judgment.  Accordingly, the motion will be granted with respect to Neaves' claim of negligent training and supervision.

## V.   Conclusion

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.      Defendants Tony Hampton, Steve Quire, and E. Humphries' motion for summary judgment [Record No. 70] is **GRANTED**.

2.      Defendants Tony Hampton, Steve Quire, and E. Humphries' motion in limine [Record No. 73] is **GRANTED**, in part, and **DENIED**, in part.

Dated: July 1, 2024.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky

- 25 -